Good morning, everyone. The case on the docket this morning is 120951-967-986. Gary Bogenberger had L versus Pi Kappa Alpha and others taken as agenda number five. Counsel, you've asked for and you've given us an outline of how you're going to divide your arguments. As the timekeeper, our clerk will only give you the warning at the end of the 30 minutes as the appellants have. So you're going to have to keep track of your 15, and you'll have to get up and pull him down if necessary to get your part. Thanks, Mr. Rieses. Good morning, and may it please the Court, my name is Mike Rieses, and I'm here today on behalf of the fraternity members and officers of the local chapter. These appeals arise from an order of the trial court that dismissed the fifth amended complaint. The appellate court affirmed in part and reversed and remanded. As to the members and officers, the court held that the plaintiff stated a claim for common law negligence based on allegations that David was forced to drink to extreme intoxication to become a member of the fraternity. The court further held that the plaintiff stated a claim based on a voluntary undertaking by all officers and members to take complete charge of David and the other pledges. We respectfully submit that the court erred for two reasons. First, there is no common law action for injury to the intoxicated person based on the gift of alcohol. And second, a voluntary undertaking was not stated for joint or in concert liability without pleading that each member substantially assisted or encouraged others to perform tortious acts. If we are correct, as to the members and officers, the judgment of the appellate court cannot stand. First, this court has stated repeatedly that few rules, few rules, are as clear as that there is no liability of common law, quote, against any provider of alcoholic beverages, close quote. That's Charles. The operative word is any provider of alcoholic beverages. Mr. Resa, so we have to look at that in context, right? As far as anything we do, we have to look at it in context, I think. Yes. And you already said, I believe in your opening remark, that you consider this a gift of alcohol, right? There was no money exchanged. Right, because Charles described social host liability, which is what we were talking about, right, and that no liability arising out of the sale or gift of alcohol. But, Justice Thomas, I would say that although Charles and Wakulik did involve social hosts, the court was talking about legislative preemption of, quote, the entire field of alcohol-related liability. Social host liability would be part of that, but social host liability is not coextensive with alcohol-related liability, because drinking can occur in many different situations. It can occur when you go into a bar. It can occur if, and I didn't really even know this until I had to do the research, apparently it's against the law if you're an adult and you pay for accommodations in a motel room to facilitate underage drinking. Drinking can take place in a variety of different contexts. It's not just the social host that Charles and Wakulik specifically involved. I'll get back to the gift in a minute, but in Charles, here's a quote from Charles. As a matter of public policy, the furnishing of alcoholic beverages is considered too remote to serve as the proximate cause of the injury. That same public policy doesn't apply here, does it, when you're asking pledges to drink until they were unconscious? Does that apply here? I think in that situation, if the liability is alcohol-related, the same public policy applies. What does alcohol-related liability mean? Well, is that behavior that was exhibited or pled in this case too remote to serve as the proximate cause of the injury? I think that if the liability is alcohol-related, the fact that, you know, there may be conduct that violates a statute doesn't make it any less alcohol-related. Consider Charles for a moment. In Charles, remember, you've got two brothers. One is 18, the other is 21, and they get a 16-year-old girl drunk. And this is before there was a statute passed that explicitly created a cause of action, okay? And the theory was, well, the drinking contributed to the delinquency of a minor in violation of a criminal statute. And that was argued to show that this fit within the Queen Haven framework where you have something more going on than just drinking. What did this court do? This court said that even though there was a violation of a statute, it was still alcohol-related liability that was legislatively preempted. There is simply no room for recognition of a common law action against a college student or fraternity for supplying the alcohol. You need legislation. And to date, the legislature has created alcohol-related liability against only three classes of defendants. First, you've got the dram shop. Let's get back. I promised you to get back to gift. Okay. Right? That's not how plaintiff pled this, though, right? Plaintiff pled that. Not as a gift, right? They pled it that the pledges were required to drink until they became unconscious. And we have to take that allegation of the complaint as true. I agree. You have to take it as true. But whether – I think it was a gift because there was no exchange of money. Okay? They were given the vodka. They were told to drink the vodka. They were called names, so they didn't drink the vodka. But all of the conduct is still alcohol-related. He died from .43 blood alcohol. The drinking was alleged to be a requirement for membership. Do I understand you, then, that the analysis would be different if instead of consuming alcohol the decedent was required to do some other criminal activity or some other highly dangerous activity, like jump off the roof? Well, in that situation, okay. So I think what you're really saying is, well, if the hazing took the form of some other conduct than drinking and it resulted in injury, he would have a cause of action using common law tort principles. It could be an assault. It could be a battery. I guess it could be intentional infliction of emotional distress, although I don't think that would be a violation of the Hazing Act because the Hazing Act is limited to bodily injury or, you know, death. But certainly, under certain circumstances, the hazing could result in a common law tort action. But my – okay, I'm sorry, Justice Bergus, you were saying? I was saying, following up on Justice Garland's question, as though if he was required to have alcohol and jump off the balcony, what happens there in your scenario? Well, if he is going to be forced to jump off the balcony, then I think that there would be conduct that wasn't exclusively alcohol-related. If the drinking simply precedes it, it might be, you know, in what Kulick, the court said, there could have been a voluntary undertaking. I suppose if you can divide – I guess I'd answer it this way. If you can divide the conduct into something that's alcohol-related and something that's not alcohol-related, you might be on firmer ground. But to go back to Justice Garland's point, whether there's drinking involved or not, if there's hazing involved, it's a crime. And if it's a crime, it is subject to punishment. You're essentially arguing that there's an exemption from liability for the forced consumption of dangerous amounts of alcohol. I'm not saying there's an exemption. What I'm saying is it's up to the legislature to take action. I'm saying there's a preemption, not an exemption. They may sound alike, but they're very different. And what I'm saying here is that the Fifth Amendment complaint alleged a clear-cut case of alcohol-related liability. It was based on David's overconsumption of vodka, which led to his intoxication, unconsciousness, and death. Under the facts pled, liability was alcohol-related precisely because the excess of drinking was essential to plaintiff's theory. Because plaintiff's claim gave rise to that liability, legislative preemption bars a common law action, and no recovery was possible without legislation that would create a private right of action in favor of persons injured by their own intoxication. Plaintiff does not argue here that the hazing act itself creates a cause of action. That question is simply not before the court. The legislature's failure to address civil liability is too weak a reed on which to base an inference of legislative acquiescence in a common law action. Silence does not imply approval. For over 20 years, going back to the 1995 amendment to the hazing act, the legislature may have elected not to address the issue on the reasonable assumption that appellate decisions in Quinn and Haben did not survive this court's decisions in Charles and McCulloch. There would have been no need to exclude expressly what was preempted in the first place. The presumption of a legislative acquiescence argued by the plaintiff is pure fiction. Even the appellate court did not base its opinion on legislative acquiescence. To recognize a common law action would result in open-ended liability for college students who are not in the liquor business. This court in Charles found it, quote, incomprehensible, close quote, incomprehensible that a social host who is not a liquor seller should be exposed to a greater liability than the profiting dram shop under the Dram Shop Act. Yet that is the same result if this court affirms the appellate court. So the fact that there is an allegation that there was a requirement of drinking doesn't tip the balance either way. I think that's a point in our favor because it shows that the liability is alcohol-related if the drinking is an essential element of the cause of action. This claim is based on a violation of the Act. You can't violate the Act unless the drinking was required for membership. The drinking to excess is the basis of liability, and that is what is alcohol-related and preempted by this court's prior decisions, which are based on the concept of legislative preemption of alcohol-related liability, not simply social host liability. We respectfully submit that whether alcohol-related liability should extend to college students and fraternities is a question for the legislature under this court's own precedence. The legislature, as this court has recognized, is better equipped to determine questions of public policy and as illustrated by the Drug and Alcohol Impaired Minor Responsibility Act, the legislature knows very well how to create alcohol-related liability when it believes the public policy so requires. It would violate principles of stare decisis and judicial self-restraint to create an open-ended tort liability against college students when this court has deferred to the legislature's determination of public policy, and the legislature is not seeing fit to create a cause of action in favor of persons at least 18 years of age who are injured by their own intoxication. Second, the appellate court has unduly expanded the voluntary undertaking doctrine in this case. To plead a voluntary undertaking, plaintiff had to allege that each of 27 fraternity members affirmatively took substantial steps to perform an undertaking. Now, a plaintiff was not forced to plead in a vacuum. He had access to thousands of pages of documents from the criminal investigations and the disciplinary proceedings of Northern Illinois University. Even so, the Fifth Amendment complaint did not allege what affirmative steps each member or officer specifically performed. To avoid having to plead who did what, plaintiff alleged that the fraternity members and officers acted jointly and in concert. That's in Counts 5 through 8. However, to plead in concert liability, plaintiff had to allege that each fraternity member gave, quote, substantial assistance or encouragement, close quote, to the others to engage in tortious conduct. Even after five attempts to plead, plaintiff did not allege what substantial assistance or encouragement each member gave to the others. Counts 5 and 8 through 8 did not use the words assist or encouragement to describe the act or the failure to act. It was defective on its face. I see that my time is about up. If there are no questions, we ask that you reverse the appellate court and defer the trial court. Thank you. Thank you, Mr. Reeses. Good morning, Your Honors. Michael Rasek. I am here on behalf of Gary Bogenberger, who is the plaintiff appellant as to the national fraternity and the non-members, and the plaintiff appellee as to the local chapter and the fraternity members. If I can begin with tying into a comment Mr. Reeses made, he said the legislature, if they had wanted a case like this to go ahead, would have said so, would have acted, and our answer is they have acted. That's what the Hazing Act is all about. What the chapter and the members are asking this court to do is to take the Hazing Act, which is an act that covers all kinds of hazing, and dissect out one small type of hazing, which would be hazing with alcohol, hazing involving alcohol. The literature in the cases show, ironically, that hazing and alcohol seem to be the predominant combination. So what the chapter and the members are actually asking this court to do is to take a statute that the legislature has passed, which clearly wants to stop hazing of all kinds and take out probably the largest part of that statute so that there is no civil remedy. Clearly the statute itself does not provide a civil remedy. That's correct. It's a criminal statute. Exactly. The argument here is that there is a statute, but because of the lack of civil remedy and the legislature knows how to provide for that, we should not see this as a statute. It's created a private right of action. The other argument is that this is prima facie evidence of negligence. How do we work through those ideas? I work through those ideas with the legislative history. No one quarrels. I don't believe anybody's quarreling with the idea. I don't think anybody's quarreling with the idea that under the Hazing Act, there is a common law right of action based upon the fact that you have a hazing act setting a duty and the people involved here are within the scope of that act. The injury is the kind of thing that the act was designed to prevent. All they're trying to do is dissect out the alcohol-related part. Looking to whether the legislature would have approved or not approved, the legislative history appears to be entirely on the side of the people claiming a right of action because we know in 1995 when the legislature looked at the Hazing Act, they looked at alcohol. They looked at hazing. They looked at all the elements that are here, and again, and that was 1995 is long after Hobbin and Quinn were on the books. They were supposedly aware of them. Again, that's the premise. That's the presumption that the legislature is aware of existing. You're saying there is an implied private right of action in the statute? No, I'm saying looking at the legislative history would show that recognizing a common law action is something that the legislature had in mind so that there's no – this Court would not be in conflict with the legislature if it approves the right of action for hazing involving alcohol that Hobbin and Quinn recognized because the legislatures were aware of those cases and did nothing to cut them out of the Hazing Act, even as recently as 2013 when they went back and looked at the Act again. At that point, looking at the legislative history and looking at the various comments, the legislators were aware of hazing, of alcohol, of its importance, and of civil lawsuits, and they did nothing at that point to suggest or to change the law in any way to prevent or to bar a common law right of action for violating the Hazing Act where alcohol is involved, which is this case. So we don't need a private right of action. We're just simply happy to have the common law action that has been recognized. The amicus mentioned there's no duty on the part of homeowners to put in fire alarms, but once that duty was established by the statute, the courts recognized that violating that duty gave a right of action, a common law right of action to those who were injured. Counsel, for clarification, you did not cross appeal on the house corporations. That's correct. They're not part of this case. That's not an issue. Absolutely. You're representing the plaintiff, but this is against the female that were involved and the national. Exactly. And national, I think, correct me if I'm wrong, is trying to rely on their no-hazing policy, right? But it's pled as if they've ignored their no-hazing policy? Exactly. That's, unless there are questions to me, that's my transition to that point. As to the national, the national's primary and really almost only defense is we can't possibly be at fault because we passed a law. Their other defense is that we can't possibly be responsible for what our members did. I thought the Hamlock case, which the national did not distinguish, said it best. In that case, a railroad said, we can't be at fault for what that railroad worker did because we told him not to do it. And the court there said, that's not good enough, not when you have ignored, not when you've done something to ignore it. Well, you've gone a step further, right? You're saying that they encouraged the local chapters to engage in the conduct at issue? Absolutely. And they did more. The national's people, however, the consultants or employees, however you define them, told the people, this is good for us. And ironically, there may be some terrible truth to that. That's why we gave the court the various literature and the cases that talk about the fact that there's a benefit to the national, apparently, because hazing, according to the literature and according to the cases like Oja, Khalil case, creates a bonding effect. And what that does is boost their membership. And as one court said, bringing in new members is the life of the national fraternity. If they don't have members, they don't have a national fraternity. So looking at the conduct of the members, and the national does not disagree that the members are, in fact, their agents. They're just saying for what they did, they're beyond the scope of their agency. But if you have the national encouraging the members to do something, that's a direct liability. And if you have the national allowing the members to carry out this kind of hazing activity, keeping in mind that we have alleged that this has been going on for years, both in this house and other houses around the country for this fraternity and in other fraternities, that the national had to know what was going on here. And we say that also in part because you have the consultants who come to this chapter. They have a defined duty to be there to check everything out. When those consultants showed up, they found that this chapter, and it's acknowledged by them and alleged in the complaint, they found that this chapter did not have a risk awareness program. It hadn't had such a program for three years. A risk awareness program, as you can tell from the fraternity website, is the program that the national uses, that they give to the locals, that reminds the young people there that they can't do this. It's against the rules. They had no such program here. And the very absence of a program should suggest to the national that what's been going on for years is still going on for years. I can't say that that's going to definitely define the outcome of this case, but we are so far away from the final outcome of this case. We're at the very pleading stage, which if the court would recognize, that's our handicap. We can only deal with what we've been allowed to learn to date. So is that your position generally, Mr. Resnick, that if the court agrees with you with respect to whether alcohol-related hazing is actionable, then let's sort this out. We're at the pleading stage, and we plead it. I mean, I imagine the discovery could show something different. The discovery in this case could go either way, but as one of the justices noted, at this stage we are at the pleading stage. We have a complaint, and we have a complaint that just wasn't pulled out of thin air. The appellate court noted that plaintiff's counsel provided an affidavit to the trial court saying, this is where I got this information, and this is why I believe the following things are true. He was not going on a flight of fancy. If you have a situation where you have certain facts, you should be able to reasonably deduce what the other facts are. And looking at the history of this case, looking at the history of this kind of hazing in this fraternity, looking at what happened here, and looking at and talking to people and seeing what little information he got, he was able to deduce that somebody at the National told this local, this is good for you. It's good for us, and it's good for you. And that's why, going back, certainly back, that's why the legislature intervened. And that's just, I guess, to cap that off. The cases have stressed that this kind of behavior is behavior that, although we would all shake our heads and all hope our children didn't do it, when you put people into this scenario, it's foreseeable. It happens all the time. It's called social pressure. We're not talking about, and circling way back, we're not talking about the pressure from being a party that everybody has a drink at the party and maybe I'll feel out of place if I don't have a drink. We're talking about group pressure called social dynamics where these people want to become a member. They see this as an act of prestige. The local chapter is behind it. The national chapter stands behind the local chapter. This is not in an Ada Neu house. It's in a Kappa house. That's the sign that's in front. Looking at those aspects of it, you've got the control at the national level. You've got the control at the local level. You've got the encouragement all through the system. That should support a common law cause of action. We've met all the criteria for a common law cause of action. We've also satisfied, and I don't think I need to go through it again, we've satisfied the normal prerequisites, the normal analysis for a duty. Looking at foreseeability, I don't think anybody can test it. It's not foreseeable. Looking at the burden, there is no burden on anyone here. Looking at the significance of putting the burden on the fraternity, there can't be any significance to asking somebody to do what the Illinois legislature has already told them to do. Mr. Reese has seemed to indicate that this was a social host situation because there was no dollars exchanged. Are you arguing this is a social, not a social host? Is this something different because of the way the alcohol was, you're alleging, forced upon them? Completely different. And the cases bear me out. That's why I cited the OJ case, OJA from New York. This is not a social situation where people are simply standing around. This is a pledging hazing situation where the instrument happens to be alcohol. Are you basing that on the Hazing Act? I'm basing that on the Hazing Act, and I'm basing that on what the courts describe hazing as. Hazing is using pressure to get people to do things they would normally not do. And here the thing they'd normally not do is drinking cups of vodka. Nobody would do that. So if this were in a private home and somebody was – would you have the same situation where someone did more than encourage people to drink? That would take us outside. Then I would lose the duty created by the Hazing Act, and that would be beyond us. I can no longer plead that as a Hazing Act case. So the Hazing Act is important to your argument. I'm willing to admit, I think I've said it in the brief, the Hazing Act is critical to this situation. It reflects not only the legislature's intent, but it also is the underpinning of the clear duty in this one very limited scenario where hazing is used as part of a process of pledging in an institution. A remarkably narrow duty. Could you, in the few minutes you have left, address the non-members? Because you've talked about the benefit, the national gap, and so forth. What benefit do they get? To the non-members? The benefit to the non-members is the basement rate. The benefit to the non-members can't be significant, but the benefit that we're looking to is the benefit to the national, and the national benefited from the acts of the non-members. The fraternity – That would be vicarious to the national, not direct liability as to the non-members. The only answer I can give the court is to the non-members is that the statute itself says that any act by any person – and the Hazing Act does not require a benefit to anybody. The Hazing Act just looks at what you do and why you do it. And they did it as part of an act, a combined act, to cause these people to become members of the fraternity. Their argument is they can't vote, and that's true, they can't vote. But, nonetheless, they're part of the process that the legislature wanted stopped. That's about the best answer I can give that, John, unless the court has further questions. As to the chapter and the members, we ask that the court affirm. As to the national and the non-members, we ask that the court reverse and remand. Thank you. Thank you. Mr. Noland? Good morning, Your Honors. May it please the court. My name is Dan Noland, and I represent the non-member women defendants. I'm arguing today on behalf of the non-member women defendants. We have joined the briefs of the other defendants with regards to the legislative preemption of alcohol-related liability. My argument this morning focuses on the reasons the trial court and the appellate court correctly decided the duty issue in favor of these non-member women. Even if this court finds that Quinn v. Sigma Rho and Haven v. Anderson created an exception that survived Charles v. Siegfried and the Walker-Lick case, such exception does not extend to non-members of the fraternity. Plaintiff has asked this court to interpret the hazing act such that a non-member of the fraternity has a duty to a prospective member or pledge of the fraternity not to serve him alcohol and not to use peer pressure or social pressure to encourage the excessive consumption of alcohol. Plaintiff has not alleged any facts to support that a woman who is not a member of a fraternity could actually require David Bogenberger to drink to intoxication in order to become a member of that fraternity. There is no factual allegation. Mr. Nolen, they weren't acting as social hosts, though, right, these non-members? Well, these non-members, Your Honor, this was not their home. They weren't hosting the party themselves. So the best we have is that they were actively participating in illegal hazing. So how would they take refuge under a social host no-duty rule if they're not social hosts and they're participating in the hazing? Well, I think to answer your question is twofold. First and foremost, I think under the Quinnen-Haven and the Hazing Act, the linchpin that Quinnen-Haven used under the Hazing Act was essentially that it wasn't the individual member's peer pressure to consume alcohol. It was the organization's requirement to do so as a portion in order to become a member. So it's more about the power than it is about the role that any one person played in it. There is also no factual allegation that any of the non-member women were involved in any way in the internal pledge requirements of the fraternity. Judge Flanagan at the trial court level and the Illinois Appellate Court Justices Harris, Cunningham, and Connors all agreed that a non-member of the fraternity does not have a duty to a pledge because they don't have any authority to determine who would become members of an organization for which they do not belong. Is there any danger if we agree with your argument that, in fact, we'd be encouraging organizations to outsource hazing? I don't think that would encourage organizations because if the linchpin, again, is the requirement by the organization that pledges do something, the liability, if it still exists, is going to fall on that organization regardless of who plays what role in that process. And I think when you follow Quinnen-Haven and the Hazing Act, that's really what it's saying, is you have to have this power or control over someone in order to require them. Otherwise, you really don't have any different situation than being in a house and someone, you know, using peer pressure against someone younger or, you know. I want to get back to what exempts them from liability. I'm thinking back to Justice Garmon's question to Mr. Reeses about other types of activity. I can't remember exactly if it was, you know, they're required to run into a wall and you have a non-member pushing them as they're running toward this wall. They happen to be a non-member. What would exempt them from liability? I mean, when we talked about it with Mr. Reeses, you know, he said, well, that's a different situation than the drinking because there's a carve-out for the drinking. But there has to be something that would exempt them from their actions from liability, right? And that exemption would be that they do not have the power under the Hazen Act or under, you know, the appellate court's decisions in Quinn and Haven to require them to do anything. They can tell them just like anyone else could tell someone to do something. But the liability comes from the requirement that these pledges allegedly know they have to do this to become members. So it's a different situation for the non-member in my example of the wall? If they say, hey, run into the wall versus as they're running they push them to help them to run into the wall? I think exactly. If someone physically pushes someone into a wall, you don't need the Hazen Act to respond to that. That's an assault or a battery. You know, for the Hazen Act to apply, you need that nexus between the actual requirement by the organization in order to create the liability. And I believe that, you know, following the ‑‑ But there is participation by the non-members in encouragement of the activity that is being sponsored by the fraternity. I mean, that's what the allegations are, yes. Okay. Counsel, but they're there because they were asked to be there to participate in the enforcement of the requirements of the Hazen. The allegations are that they, right, were invited to the party to participate in the party. Yes. But there are no allegations that these non-member women had any role whatsoever in creating the requirements by the fraternity as to what the pledges would do or what the fraternity may have communicated to the pledges as to what was required. They, as having no role in determining whether someone can be a member in this organization, their communications with those pledges in this context is really the difference between participation and power. They have no power to compel. But weren't they perceived by the applicants to have power? They were there in the pressuring? I think that's where the line needs to be drawn, if there is one, is that, again, the idea that we're trying to prevent this would have to start with the requirement that they do it. And who determines that requirement? Could you put it in the context of our traditional duty analysis? Did these non-members have a duty to the pledges, understanding that these non-members understood what was happening here, the hazing that was going on? Well, I guess in order to answer your question, what I'd have to ask is what we're trying to address here as far as under the traditional duty analysis, the reasonable conduct for the benefit of the plaintiff, right? Is the issue for reasonable conduct that of no peer pressure and no serving alcohol? Or is that reasonable conduct that we want to not have a requirement that pledges consume excessive amounts of alcohol as part of becoming a member of a fraternity? So when we talk about the magnitude of the burden or the consequences of the burden, the issue is going to be that are these non-member women the right person to place that duty on, that responsibility for pledges in an organization that they don't belong to? So I think under that traditional duty analysis. Because of the magnitude of the burden? I'm just trying to put it in kind of a lawyerly way. Right. I mean, I think it's a consequence. You know, it's a balancing of those. But both the magnitude of the burden and the consequences of that burden would indicate that you're not going to prevent this situation by putting a duty on a non-member of an organization. Could you just stop you there? Because you are kind of repeating. I'm sorry. How about foreseeability? When we talk about duty, we talk a lot about foreseeability. Well, foreseeability, I think in many of the cases that talk about foreseeability, they say in hindsight when an act or an accident happens, it's easy to say it was foreseeable. So, I mean, to say that it was foreseeable that someone would die based on their participation, I mean, everyone may have their own opinion on that. To say is it foreseeable that, you know, someone could get drunk, certainly it's foreseeable. And so I think that's foreseeability alone, though, is not going to be the determination as to whether a duty is placed on these women. I actually think I've, unless there's other questions, I've kind of exceeded my time. And so I will yield to Mr. Mock. Thank you, Your Honor. Thank you, Mr. Nolan. Mr. Mock. Thank you, Your Honors, and good morning. May it please the Court, my name is Eric Mock. I'm here on behalf of the PI-CAP Alpha National Fraternity and the National Corporation. For purposes of this argument, I'm going to refer to them both as national. The question for this Court as it respects national is actually quite simple. It's a straight-ahead 615 analysis. It's pretty narrow. Did the Fifth Amended Complaint allege a sufficient theory of liability against national? The Circuit Court and the Appellate Court obviously found that it did not. And if this Court, as it should, simply applies straight-ahead conventional 615 analysis with a basic understanding of agency law, it's going to reach the same conclusion. You don't have to reconsider social host liability. You don't have to revisit Supreme Court precedent to reach where national would like you to go. You simply have to look at the Fifth Amended Complaint within its four corners and assess whether the Bogenbergers have alleged a sufficient theory of liability. Now, to be clear, the Fifth Amended Complaint doesn't allege any specific theory of liability, but the Appellate Court correctly sussed out that it either had to be advancing a theory of vicarious or direct. Now, to plead vicarious liability is quite easy. It's very conventional. You see it all the time. You simply caption a count, vicarious liability. You lay out the elements. Fifth Amended Complaint doesn't do that, but the Appellate Court nevertheless undertook that analysis. And the test here is whether the principal has the right to control the manner and methods of the agent's work. The Fifth Amended Complaint never alleges that against national. It never alleges that national played any control over the pledging process. It never alleges that the national knew that this particular mom and dad's night was taking place. It never alleges that national played any role in the planning or execution of this particular event. In fact, the most operative paragraphs of the Fifth Amended Complaint are paragraphs 5 through 34. That's where the allegations as to how this went forward are most granular, and nationals never mention it. In fact, nobody has. It's 27 presently unknown members. National is never mentioned in the most operative facts within the four corners of the complaint as respects how this mom and dad's night was planned and executed. Nor could, quite honestly, the Fifth Amended Complaint allege a sufficient theory of liability. Because national in this case is rather unique in the sense that my client is the only one I believe still in the case. I could be wrong, but the only one still in the case who's actually given a deposition. There was one young man who gave a deposition and was promptly dismissed. Justin Buck, President of the National Fraternity, gave his deposition. It was three hours long. He testified that national plays no role over the means and methods of pledging. It did not know about this particular event taking place. It played no role in the planning and execution of this particular event. And they're housed in Memphis. That deposition took place before the Fifth Amended Complaint was filed. There would have been no good faith basis factually for counsel in that Fifth Amended Complaint after that deposition to allege that national played any meaningful role sufficient to allege agency. Arguably, it would have been a 137 section because it would have been a factually, objectively factually incorrect allegation. Beyond that, though, the Fifth Amended Complaint does plead that the national has promulgated core values in the form of rules and regulations and principles, one of which is their prohibition as an expression of a core value against hazing and against the use of alcohol in the pledging process. The Fifth Amended Complaint alleges that that guideline existed and that it was a violation of that guideline for this mom and dad site to go forward. So you have a complete absence within the four corners of any allegation of control at any point of the pledging or this particular event planning by national. You have the affirmative pleading of this regulation and control prohibiting exactly this type of conduct. And when it's all said and done, when you simply apply those principles and you simply apply the same straight ahead 615 analysis as the circuit court and then the appellate court, you'll reach the same conclusion that within the four corners, no sufficient cause of action was stated against national. And therefore, I ask you on behalf of national to affirm its dismissal. And I'm here on behalf of the local chapter as well and ask that you reinstate its dismissal. Thank you. Thank you. Mr. Reeses, I believe you have five minutes. Thank you. I want to go back to the first question that Justice Thomas asked, which suggested that drinking as a form of hazing differs from social drinking. And I think that's in the background to a lot of what we're talking about today. Even if that's true, it doesn't prove anything about the viability of the plaintiff's claim. The issue here is not whether we were social hosts. The issue is whether or not the liability alleged by plaintiff in the Fifth Amendment complaint is alcohol-related. Opposing counsel never really tells you what it means to have liability that's alcohol-related. It's a broader concept than social host liability. All the court is saying in the past about social hosts in Charles and McCulloch is basically knowingly supplying alcohol to someone else. And that can happen in the home or outside the home. But the issue here is broader than that because drinking can take place in settings, in a variety of settings, that don't fit categories of what is a social host. The Fifth Amendment complaint alleges a clear-cut case of alcohol-related liability. If you look at the allegations, almost every allegation involves excessive drinking. And the excessive drinking was a requirement for membership in the fraternity. The fact that that conduct also violates a statute does not make it any less alcohol-related. I already gave you the example in Charles where a violation of the statute contributing to the delinquency of a minor did not support a cause of action at common law. I mean, you're saying it doesn't make any difference whether it's voluntary, or voluntary excessive drinking will require excessive drinking. If it's excessive drinking, I think if it's excessive drinking, that's the beginning and the end of it. Because then it becomes a matter for the legislature. It becomes a matter for the legislature to take action. And they have taken action when they believe the public policy so requires. And we're not, look, we're not trying, I'm not here trying to condone hazing. Because I also think that might be, you know, in the subtext here. I'm not here defending hazing, and I'm not trying to create exceptions to hazing. All I'm saying is that all forms of hazing are subject to criminal prosecution under the Act. The Act does not create any civil remedy. The amendment to the Act only dealt with how to enhance the penalty and clarify the language to avoid a constitutional challenge on vagueness grounds. And then whether it's good public policy to fashion a civil remedy for those who are injured by their own intoxication above the age of 18, in addition to making that same conduct criminal under the Hazing Act, is a matter that should be left to the legislature. Now, to conclude, I think I want to say, if you take nothing else from my argument today, this case is not about whether fraternities are good or bad. Opposing counsel gave everyone a copy of this book, and I think that there is a real effort made to somehow demonize fraternities or have us have to defend what occurred here. That's not what this case is about. This case is about who gets to decide the scope of alcohol-related liability under a democratic form of government. And for over 100 years, this court has deferred to the legislature as competent to decide matters of public policy relating to alcohol-related liability. And if this court follows its own precedent, it will reverse the appellate court in favor of the fraternity members and affirm the circuit court. If there are no further questions, thank you for your time today. Thank you. As to the national, what the national cannot do, it did not do, was to look at the cases that we cited that have facts and national, local organizations similar to this case and distinguish them. The Brown case from Maine, in that case not a hazy case, but the same question was, what did the national have to do with the local fraternity? And the court there looked at situations pretty much like this and said, when you have a national that controls so much of the local fraternity, they do have the ability to control if they want to take that control. Alexander in Tennessee tracked to the same thing. The Kenner case, the later case in Pennsylvania, tracked the same thing. If the court looks at those cases, they will see the same kind of footprints here, and those footprints all led to finding a duty. Overriding all of that, however, remains the fact that the national has no answer for the simple allegation that they directly caused this. It's their fault. They set it up. They want to do it. They encouraged the people to do it. If that's right, then we're going to win that case. We should win that case here, and we will win that case at the trial. At the very least, we have a right to take that case further to see if we can prove what we allege. Unless the court has further questions for me, this subject has been pretty well exhausted this morning, and I appreciate that. I thank you for your time. I guess we've heard from everyone we're going to hear from today. Thank you. This case, No. 120951 and other numbers, will be taken under advisement as Agenda No. 5. Mr. Rieses, Mr. Raschak, Mr. Nolan, Mr. Moth, thank you for your arguments today. You are excused with our thanks. Marshall, the Supreme Court stands adjourned until Tuesday, March 21 at 9 a.m.